**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NICOLE R.,[1]** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | **No. 22 C 1891** |
| | **)** | |
| **v.** | **)** | **Magistrate Judge Jeffrey Cole** |
| | **)** | |
| **KILOLO KIJAKAZI,** | **)** | |
| **Acting Commissioner of Social Security,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(i), 423, three years ago in March of 2020. (Administrative Record (R.) 215-16). She claimed that she became disabled as of May 13, 2019, due to a labrum repair and a pelvis fracture. (R. 215, 237). Over the next two years, the plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. Plaintiff filed suit under 42 U.S.C. § 405(g) on April 12, 2022, and the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) on April 27, 2022. [Dkt. #10]. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§404.955; 404.981. Plaintiff asks the court to remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

**I.**

**A.**

The plaintiff was born on December 26, 1990, making her just 28 years old when she claims she became unable to work, and just 30 at the time of the ALJ's decision. (R. 215, 15-32). She worked steadily as a firefighter/paramedic from 2010 through 2019. (R. 231-32, 248-49). That was until she injured her hip putting out a car fire in March of 2019. She felt a pop in her hip and developed pain through her left groin. She tried physical therapy to no avail. (R. 330).

Examination on May 14, 2019, revealed a palpable internal snap and pop in the left hip, with pain upon range of motion. Bicycle test was positive for groin pain. Faber test was positive for pain. An MRI revealed broadening dysplasia of the left femoral head/neck junction, with likely tear of the labrum. (R. 331). CT scan showed broadening of the left femoral head/neck junction, with mild spurring and calcification along the margin of the acetabelum. Diagnosis was left hip labral tear. (R. 332). Surgery – left hip periacetabular osteomy and labral repair – was scheduled for August 30, 2019 (R. 337), and then postponed and performed on October 25, 2019. (R. 339, 343-45).

At followup on November 11, 2019, plaintiff was doing well, using crutches, and taking Gabapentin for minimal pain. (R. 346). X-rays showed hardware in stable position. (R. 347). Plaintiff was told to remain on crutches until her next exam. (R. 347). On December 10, 2019, plaintiff was still on crutches and had developed low back and lateral hip pain. She was using ibuprofen and a TENS unit. (R. 352). Range of motion did not produce hip pain. X-rays continued to show proper placement. Plaintiff was instructed to remain non-weightbearing. (R. 353). A month later she was doing well and reported no pain and was told to bear 50% weight on crutches. (R. 356). On February 10, 2020, plaintiff reported increased back pain, left buttock pain, and left

2

groin discomfort. She was doing physical therapy. Her surgeon said she remained unable to work. (R. 356, 372).

By March 16, 2020, plaintiff was often back to using two crutches or a walker. (R. 359). X-rays showed some bony healing. Plaintiff was using and would continue to use a bone stimulator. She was to continue physical therapy and try weight bearing as tolerated in two weeks. She was still unable to return to work. (R. 360). On May 14, 2020, plaintiff had been full weight-bearing for almost two months, but reported increased low pack pain, deep lateral hip and buttock pain, and left leg swelling. The surgeon noted her improvement had been slow. Range of motion was "reasonable." (R. 365). X-rays showed slow healing. She was told to remain off work. (R. 366).

Plaintiff developed *right* hip pain in June 2020. Doctors speculated about a right labral tear due to overcompensation for her other hip injury. (R. 397-98).

Surgical hardware was removed on August 27, 2020. (R. 439-40). A couple of weeks later, plaintiff reported that her pain was worse than it had been following her previous operation. She was having general left hip discomfort and intermittent sharp pain. Left thigh was swollen. She was taking Celebrex for pain and using a bone stimulator. She was given a prescription for Norco. (R. 441). She could walk only gingerly; gait was painful. X-rays showed possible non-union ast the osteomy site. She was told to use one crutch for ambulation. (R. 442).

A CT scan on September 19, 2020, showed healing had still not completed. (R. 444). So, plaintiff had to have yet another procedure: repair of the left superior ramus nonunion utilizing compression technique. (R. 452, 554-61, 661). She was upset at the thought of another surgery and a further setback for returning to work. (R. 661). Following the third surgery, she was discharged on a number of medications, including Gabapentin, Oxycodone, and Tramadol. (R. 462-63).

3

On December 10, 2020, plaintiff reported left hip pain and popping. She was still using crutches. (R. 602). Upon examination, her gait was abnormal and antalgic. (R. 603). A right hip MRI on January 20, 2021, revealed a non-degenerative tear of the labrum. (R. 681). Cortisone injection in the left hip did not relieve pain she was still having there. (R. 682).

Plaintiff had a psychological consultative telehealth exam in connection with her application for benefits on January 12, 2021, with Shannon Walker, Ph.D. Plaintiff reported depression, shutting people out, and sometimes sleeping around the clock. She traced her depression to a paramedic call where four children died. She reported that she spent 210 days on crutches following what was supposed to be a simple surgery. The psychologist noted depressed mood, tearful affect at times, coherent thought processes. (R. 632). Fund of information was adequate, calculation was adequate, judgment and insight were reasonable, attention was poor, and abstract thinking was inconsistent. (R. 633).

Yet another CT of the left hip in February 2021 showed that healing was – after sixteen-month cycle of surgery, rehabilitation, crutches, repeat – *still* incomplete and the break had *still* not healed. (R. 696).

## II.

After an administrative hearing at which plaintiff, represented by counsel testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: Left Hip Labral Tear (status post surgical repair with plate and screw insertion), Right Hip Labral Tear, and Major Depressive Disorder. (R. 20). The ALJ then found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix

4

1, specifically mentioning listings 1.17, 1.21, 1.22, but rejecting those because plaintiff was not on crutches for a continuous period of twelve months. (R. 40). The ALJ also rejected listing 12.04 because plaintiff had no limitation in understanding, remembering or applying information; no limitation in interacting with others; a moderate limitation in concentrating, persisting or maintaining pace; and a mild limitation in adapting or managing oneself. (R. 22).

The ALJ then determined that plaintiff could perform sedentary work with the following additional limitations:

> occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds; can frequently balance, and can occasionally stoop, kneel, crouch, or crawl; can tolerate occasional exposure to unprotected heights, or vibration; and is able to perform simple, routine tasks.

(R. 23). The ALJ then summarized the plaintiff's allegations about her limitations. If sitting on a special pillow, she can tolerate up to an hour of sitting, but without the pillow she can only sit for ten to twenty minutes. She could probably walk a mile, but it would be very slowly, and she would be sore and swollen afterwards. She had to keep her weight shifted to her right leg while standing. She could carry ten pounds on her right side. She had pain and swelling on her right side due to a lengthy period of overcompensation. She has become depressed over all of this, and has recently started taking medication for it. The ALJ concluded that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, the plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 24). The ALJ then summarized the medical evidence. (R. 24). The ALJ then said that the medical evidence did not document a level of impairment required for a

5

finding of disability. Specifically, the ALJ explained:

> The claimant has made progress. It is understandably frustrating that this progress has not been in a straight line towards complete healing, and that the claimant has required additional surgeries with additional healing periods to get to this point. However, the claimant has improved, continues to improve, and her doctors appear optimistic for continued healing of the non-union. This is not to suggest that the claimant has not been impaired during this time. The claimant has had severe, medically determinable impairments, that have reduced her functional capacity during this time.

(R. 25). The ALJ then rejected the opinions from the state agency reviewing doctors as not persuasive due to inconsistencies regarding plaintiff's limitations, and said the record warranted additional limitations against exposure to heights and vibration and slightly more significant limitations. The ALJ said he didn't need to evaluate the report from the consultative psychological examiner because she "did not offer any opinions as to how the claimant's impairments might impact her ability to function in the workplace." (R. 25). The ALJ then explained that the plaintiff's ongoing healing of the non-union of her left hip, as well as the impact of the surgical efforts to address that condition, and the developing conditions in her right hip, warranted a restriction to sedentary work, with additional postural and environmental limitations. As for the plaintiff's depressive symptoms, combined with the side effects of her pain medications, and the distraction from pain itself, the ALJ explained he was accommodating those with a limitation on the complexity of the work. (R. 25).

The ALJ then found that the plaintiff's past work as a firefighter was beyond her residual functional capacity. But, relying on the testimony of the vocational expert, the ALJ determined that there were other jobs that plaintiff could perform that existed in significant numbers in the national economy: Document Preparer (DOT #249.587-018; 30,000 jobs); Order Clerk (DOT# 209.567-014;

45,000 jobs); and Table Worker (DOT#739.687-182; 19,000 jobs). (R. 27). Accordingly, the ALJ found the plaintiff not disabled and not entitled to benefits under the Act.

### III.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). To determine whether "substantial evidence" exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained

that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. But, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247,

252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[2] In this instance, the ALJ has not provided enough of a bridge to take the court from the medical evidence to his conclusion.

## IV.

As just discussed, "logical bridges" aren't one-size-fits-all. Some reviewers need more explanation than others, and each reviewer in federal court is reviewing the ALJ's decisions *de novo.*

---

[2] Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).
>
> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted). Much more recently, the Seventh Circuit explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

So, for example, in a recent Seventh Circuit opinion, two judges on the panel needed more of an explanation from an ALJ, *Jarnutowski*, 748 F.4th at 774-77, while the third judge on the panel, who dissented, thought the ALJ's explanation of her reasoning was adequate. *Jarnutowski*, 48 F.4th 777-79. And, the Magistrate Judge who reviewed the ALJ's opinion below was able to follow the ALJ's reasoning as well. *See Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *1 (N.D. Ill. June 1, 2021). In terms of what constitutes an adequate "logical bridge," every *de novo* reviewer is different.

And every medical record is different. Some depict young people, unfamiliar with the demands of work, who are troubled by no more than a couple of mild impairments. Records like those allow a court, without lengthy explanation, to follow the reasoning of an ALJ, who finds such an individual able to work on a daily basis. In those cases, there is not much of a "bridge" needed to make it from one side to the other, and review is not difficult. Again, it's not a one-size-fits-all proposition. But, given the medical record here, more of a "bridge" is needed.

## A.

This is a case where a young firefighter with a relatively brief, but excellent, work record suffered an injury in March 2019 while extinguishing a car fire. Doctors initially sent her to physical therapy but after a couple of months or so, it was clear that wasn't working. Doctors took an MRI and a CT scan and discovered the injury was bad enough to have to be surgically repaired. That took plaintiff into October 2019. Initially, it looked as though that did the trick. But plaintiff remained non-weight-bearing into January of 2020, when she began using a single crutch. By February, she was having a number of issues: increased back pain, left buttock pain, and left groin discomfort.

10

Things started to look up in March 2020. X-rays showed some bony healing and plaintiff went to full weight-bearing status for the next couple of months. She had increased low pack pain, deep lateral hip and buttock pain, and left leg swelling. Her surgeon lamented that x-rays showed only slow healing. She still was unable to work. She started having pain in her other hip – from overcompensating for over a year – in June 2020.

Plaintiff then had to have another surgery in August 2020 to remove the hardware from the first procedure. Her pain got much worse in the weeks that followed. She could walk only gingerly due to the pain. She was back to using a crutch to walk. She was on Celebrex and Norco, and doctors had her using a bone stimulator to promote healing. But x-rays and a CT scan showed it didn't work and that the first surgery had been a failure. And, sadly, she had to have a third surgery in October 2020. Sadly, because it was clear she wanted to go back to work. She had developed depression over her situation.

Two months after that third procedure, plaintiff was still on crutches and suffering pain and "popping" into 2021. Her gait was abnormal. (R. 668-73). On top of her continuing left hip issues, a January 2021 MRI showed she had a tear in the labrum of right hip. (R. 681). She was using Gabapentin, Oxycodone, and Tramadol, and tried a cortisone injection. CT scan and x-rays of the

So, as the medical record ends, the plaintiff's left hip still hasn't healed after three surgeries – there's still a break in the bone – and she has developed a labrum tear in her right hip after spending about two years trying to stay off her left leg. But the ALJ summarized the record in a different way, saying that plaintiff "has made progress," "has improved, continues to improve, and her doctors appear optimistic for continued healing of the non-union." (R. 24). But, "[t]he key is not whether one has improved (although that is important), but whether they have improved enough

to meet the legal criteria of not being classified as disabled." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014); *Jarnutowski*, 48 F.4th at 775. Optimistic surgeons aren't the same as successful surgeons, and thus far, plaintiff's surgeons have failed her: one can't walk without crutches or pain on a surgeon's good thoughts.

One can't even sit for very long without pain on a surgeon's good thoughts. The plaintiff testified she could sit for an hour at a time with a special pillow, but no more than twenty minutes at a time without it. (R. 23, 39). The ALJ clearly didn't believe her, not even close. He found she could sit for six to eight hours a day. (R. 23); SSR 96-9p (in a sedentary job, "[s]itting would generally total about 6 hours of an 8-hour workday"). That's six to twenty-four times as long as plaintiff said she could. His only explanation seemed to be that the objective medical evidence didn't support the plaintiff's allegations of pain. On the one hand, the Seventh Circuit has said that ALJs ought not to focus exclusively on objective medical evidence when assessing a plaintiff's allegations. *See, e.g., Lambert v. Berryhill*, 896 F.3d 768, 778 (7th Cir. 2018); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). On the other hand, the court has also made it clear that ALJs are entitled to "consider several factors, including objective medical evidence and any inconsistencies between the allegations and the record." *Zoch*, 981 F.3d at 601; *Deborah M. v. Saul*, 994 F.3d 785, 789–90 (7th Cir. 2021); 20 C.F.R. § 404.1529(c). That's because a plaintiff's allegations, "taken alone, are not conclusive of a disability," *Zoch*, 981 F.3d at 601; 42 U.S.C. § 423(d)(5)(A); *Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022)("The Social Security Act requires that an individual "furnish[ ] such medical and other evidence" of a disability in order to qualify for benefits."); *Anders v. Saul*, 860 F. App'x 428, 434 (7th Cir. 2021), and "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir.

2010); *see also Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018).

But this isn't a case where there appears to be any discrepancy between the medical evidence and plaintiff's allegations. It is perfectly understandable that someone with one hip that won't heal after three surgeries and another with a torn labrum – that's what the medical evidence shows, in a nutshell – would experience significant pain when sitting. Without some kind of an explanation as why that wouldn't be the case, the court cannot say that ALJ's credibility determination was based on substantial evidence. *Cullinan v. Berryhill*, 878 F.3d 598, 604 (7th Cir. 2017); *Minnick*, 775 F.3d at 937.

A reviewing court is charged with reading an ALJ's opinion as a whole and taking a common-sense approach to its review. *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). The insistence on common sense is not a principal unique to Social Security cases. The requirement of common sense pervades all areas of the law. Common sense often makes good law. *Peak v. United States*, 353 U.S. 43, 46 (1957). That, of course, can cut both ways. As already discussed, it's certainly not self-evident from the record than plaintiff can sit all day without changing positions. And, it is certainly not self-evident that someone with a broken bone in one hip and a torn labrum in the other can climb stairs for up to two hours every day at work.[3] It seems even more of a stretch to conclude that she could kneel or crawl for up to two hours every day. Such conclusions challenge common sense. Given the record in this case, much more of a "logical bridge" was necessary to enable the conclusion of the ALJ to be sustained.

---

[3] "'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday." SSR 96-9p.

## B.

That pain while sitting all day would certainly seem to interfere with concentration. After all, pain and concentration are not congenial colleagues. The ALJ found plaintiff had a moderate limitation on her concentration persistence, and pace. It's not clear how the ALJ arrived at that assessment. In making the finding, she cited no medical evidence, mentioning only that plaintiff said her medications made her groggy and she got overwhelmed easily, but generally finished what she started[4] and could follow verbal and written instructions. (R. 22). The ALJ ignored the consultative examiner's finding that plaintiff's attention was poor (R. 633), saying, incorrectly, that the consulting psychologist "did not offer any opinions as to how the claimant's impairments might impact her ability to function in the workplace." (R. 25). But the ALJ cannot just ignore evidence that is contrary to his conclusions. *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022); *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020). As the Seventh Circuit has held, a "moderate limitation" is defined by regulation to mean that functioning in that area is "fair." *See Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021)(citing 20 C.F.R. Pt. 404, Subpt. P, App. 1). Poor and fair are not synonymous. "Poor" is, obviously, rather worse than "fair." And poor attention, groggy, and easily overwhelmed doesn't sound like a description of someone who can:

> [c]ut[] documents into individual pages of standard microfilming size and format when allowed by margin space, using paper cutter or razor knife. Reproduce[]s

---

[4] It's also worth pointing out that while the plaintiff indicated she finished what she started, like movies or conversations (R. 265), she also said that chores took all day. (R. 262). *See Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021)("Yet the ALJ overlooked, or at least did not acknowledge and engage with, the limitations with those tasks that [plaintiff] included in that same report . . . ."); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (remanding because ALJ ignored claimant's qualifications "as to how he carried out [daily living] activities"). Additionally, when this statement was made, plaintiff was yet to go through two additional surgeries when the one she was recovering from at the time was finally conceded to be a failure by her doctors.

document pages as necessary to improve clarity or to reduce one or more pages into single page of standard microfilming size, using photocopying machine.

https://occupationalinfo.org/24/249587018.html.

But that is what a document preparer does – one of the simple, repetitive jobs the ALJ found the plaintiff could do. It sounds like pretty exacting work that demands a lot of concentration all day, every day. Imagine doing it while sitting and shifting from a broken hip to a hip with a torn labrum all day, seven days a week.[5]

The Commissioner argues that the ALJ's finding is supported by the reports from the reviewing psychologists, Gayle Williamson and Ellen Rozenfeld. Dr. Williamson found plaintiff had a moderate impairment of concentration and in the ability of completing a normal workday and workweek, but that she could still concentrate well enough to carry out multi-step tasks for a normal work period. (R. 81). Dr. Rozenfeld found only a mild limitation in concentration. (R. 99).[6] But, we can't accept the Commissioner's argument for two reasons. First, the ALJ discarded these opinions as not persuasive. The Commissioner is providing an explanation for the ALJ's conclusions

---

[5] "Table worker", another job the ALJ thought plaintiff could sit all day and do, does not sound like a bargain for someone suffering sitting in pain from a broken hip and a torn labrum either: "Examines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles." https://occupationalinfo.org/73/739687182.html  Many "simple, routine" jobs are made up of precisely this type of tedium. Those of a certain age might recall the classic Lucille Ball–Vivian Vance sketch where the two were tasked with wrapping candies coming down a conveyor at a candy factory and were woefully unable to manage it. Such jobs are exceedingly simple, and perhaps mind-numbingly routine. But for one whose concentration waxes and wanes with understandable pain from failed hip surgeries, it is a daunting occupation. This is why a limitation to unskilled, simple, routine work does not necessarily account for a limitation in concentration. *Joanne F. v. Berryhill*, 370 F. Supp. 3d 935, 941 (N.D. Ill. 2019); *Sheila W. v. Saul*, 395 F. Supp. 3d 974, 980 (N.D. Ill. 2019).

[6] Oddly, the reviewing psychologists seemed to think that because plaintiff was a young person, her impairments *had* to meet a listing in order for her to be found disabled. (R. 71, 79). That's obviously not true, but it is possible that's how they arrived at their conclusions that she was not disabled.

that the ALJ did not employ. The court is restricted to review of only the ALJ's rationale, not that of the Commissioner's able lawyers. *Poole v. Kijakazi*, 28 F.4th 792, 796 (7th Cir. 2022); *Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021). And second, the Commissioner proposes that this case is precisely like the scenario in *Urbanek v. Saul*, 796 F. App'x 910 (7th Cir. 2019), where the court accepted a limitation to "simple, routine tasks" as an accommodation for a moderate restriction on concentration, persistence, and pace. But, there, the ALJ had specifically relied on a medical expert's testimony to formulate the plaintiff's residual functional capacity. *Urbanek*, 796 F. App'x at 914. Here, as already noted, the ALJ rejected the medical opinions from the reviewing psychologists; they provided no basis for the ALJ's residual functional capacity finding. The Commissioner cannot lean on them in hindsight.

As this case must be remanded for other reasons, we need not reach the plaintiff's remaining arguments. However, it is worthwhile to review the ALJ's consideration – or refusal to consider – whether plaintiff's condition was medically equivalent to Listing 1.21. The ALJ rejected consideration of Listing 1.21, explaining that the listing:

> considers a soft-tissue injury. The ongoing surgical management that could possibly satisfy this listing is to address the hip dysplasia, and the non-union of the hip bone requiring the surgically implanted hardware, which is not a soft-tissue condition.

(R. 21). But, the listing is not quite so exclusive. Under § 1.00(M)(3), "[w]hen a complex fracture involves soft tissue damage, the treatment may involve continuing surgical management to restore or improve functioning. In such cases, we may evaluate the fracture(s) under 1.21." 20 C.F.R. Pt. 404, Subpt. P, App.1, § 1.00(M)(3). As such, the ALJ was too dismissive of consideration of Listing 1.21, and should address it more fully on remand. *See Wilder v. Kijakazi*, 22 F.4th 644, 652 (7th Cir. 2022)("... an ALJ must discuss the listing by name and offer more than a perfunctory analysis of

the listing . . . ."); *Jeske v. Saul*, 955 F.3d 583, 588 (7th Cir. 2020).

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for what she calls "summary judgment" [Dkt. #15] is granted, and the defendant's motion for "summary judgment" [Dkt. #17] is denied.

ENTERED:_____
           **UNITED STATES MAGISTRATE JUDGE**

**DATE:** 2/13/23